IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 23, 2015 at Knoxville

## STATE OF TENNESSEE v. CHARLOTTE RENEE STANFORD

### Appeal from the Circuit Court for Giles County
No. 16546     Robert L. Jones, Judge

_____

### No. M2014-01886-CCA-R3-CD – Filed August 18, 2015

_____

The defendant, Charlotte Renee Stanford, was convicted by a Giles County Circuit Court jury of theft of property in an amount of $10,000 or more, a Class C felony; filing a false report, a Class C felony; and conspiracy to commit theft in an amount of $10,000 or more, a Class D felony. The trial court imposed an effective sentence of five years, with one year served in incarceration and four years on supervised probation. On appeal, the defendant challenges the sufficiency of the convicting evidence. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee, for the appellant, Charlotte Renee Stanford.

Herbert H. Slatery III, Attorney General and Reporter; Lacy Wilber, Senior Counsel; T. Michel Bottoms, District Attorney General; and Jonathan W. Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The State's proof at trial showed that the defendant, along with two co-conspirators, developed and executed a plan to feign a robbery at the Murphy Oil gas station where she worked, for which she was indicted for theft of property in an amount of $10,000 or more, filing a false report, and conspiracy to commit theft in an amount of $10,000 or more.

## State's Proof

Sergeant Keith Crabtree with the Pulaski Police Department testified that he responded to a robbery call at the Murphy Oil Mart at 4:40 a.m. on October 1, 2013. When he arrived, Sergeant Crabtree saw Mary Hall in the parking lot, and she was wearing a "Murphy U.S.A." shirt, so he believed her to be an employee. Ms. Hall was standing near the storeroom at the back and was talking to the defendant, who was in the storeroom. In the storeroom, Sergeant Crabtree saw several pieces of gray duct tape lying around the room, and the defendant reported that she had been bound with duct tape during the robbery.

Sergeant Crabtree asked the defendant for the details of the robbery. She told him that she was in the drink cooler area around 3:30 a.m. when a male approached her from behind and pressed something hard into her back that she assumed was a weapon. The defendant told him that she got a good look at the perpetrator, but not of his face because he possibly had on a white mask or white face paint. She believed that the perpetrator was a white male because of the sound of his voice. The defendant told Sergeant Crabtree that she was forced into the main office area, and the perpetrator demanded that she open the safe and give him the money. The defendant said that she complied, and then the perpetrator forced her into the storeroom and bound her wrists and legs with duct tape before leaving. Sergeant Crabtree thought that it "was a little odd" that the defendant told him that she did not get a good look at the perpetrator's face although she also told him she had been on the floor looking up at the perpetrator as he bound her wrists and legs. Sergeant Crabtree said that the defendant was sitting on the floor when he arrived and remained there as she relayed details of the robbery to him. Sergeant Crabtree noted that the defendant "seemed extremely nervous and upset," but he did not observe any physical injuries to her.

Yomar Serrano, a district manager for Murphy U.S.A., testified that the defendant had worked for the company since November 2007 and, on the date of the incident, was the acting store manager. Mr. Serrano stated that the store closed at midnight and opened at 4:30 a.m., but he had implemented a district policy that the safe was not to be opened before 8:00 a.m. for safety reasons. He had also told the managers that no one was to utilize the safe after 6:00 p.m. For safety reasons, Mr. Serrano wanted his employees to open the safe when another employee was on duty. He also knew that it was difficult for an employee to prepare a deposit and take care of customers at the same time.

Mr. Serrano testified that each store had a start-up safe deposit box to provide cash for when the store opened at 4:30 a.m., which meant there was no reason the safe needed to be opened to start the register for the day. However, he acknowledged that there were certain situations where a manager might be required to open the safe before or after the hours set by his policy. The safe in this particular store had a time delay, meaning one

had to wait ten minutes in order for the safe to open after hitting the delay switch on the front of the safe with a key.  He acknowledged that the safe had to be opened at some point during the day in order to take deposits to the bank, inventory the Tennessee Lottery tickets, fill the safe with change, inventory the coupons, or if the cashier needed bills for the till.

Mr. Serrano stated that the store's stock had to be inventoried at the start of every day, which included physically counting all of the cigarette cartons in the store.  Additionally, because the robbery occurred on October 1, 2013, there were additional first-of-the-month tasks that had to be performed, such as putting out new signage about the price of cigarettes and other products.  Also, at the first of the month, the coupons that were kept in the safe had to be counted.  Mr. Serrano noted that, although the gasoline pumps were not activated until 4:30 a.m., a customer could purchase other items, such as drinks or tobacco products, if the clerk was in the kiosk.

Mr. Serrano testified that once he was notified of the robbery, he drove to the store and gave the surveillance footage from the security cameras to the officers.  A camera outside the booth kiosk where the safe was located had been spray painted.  Mr. Serrano calculated that $11,376.79 was the total amount of cash taken from the safe.

Mary Hall testified that she was a co-defendant in this case and had been charged with theft over $10,000, false reporting of a crime, and conspiracy to steal over $10,000.  She admitted that she had accepted a plea agreement in exchange for her testimony against the defendant.

Ms. Hall testified that she had been close friends with the defendant's stepdaughter for a number of years and had lived with the defendant "from time to time."  Ms. Hall's daughter also lived with the defendant when Ms. Hall lived with her, and the defendant babysat Ms. Hall's daughter on days when Ms. Hall had to work.  The defendant helped Ms. Hall get a job at Murphy Mart, where she had worked for about six months before the incident in this case.

Ms. Hall testified that, about three weeks prior to the incident, the defendant brought up the idea of robbing the Murphy Mart.  The defendant indicated that "[m]oney issues on her part and on [Ms. Hall's] part" were the reasons to commit the robbery.  Ms. Hall recalled that she and the defendant had talked about money issues "from time to time" and that the defendant's money issues concerned medical bills and "different little loans."  The defendant told her it would be "easy" to rob the Murphy Mart on a day when there was "quite a bit of money in the safe," and the defendant would be the person who opened it.  Ms. Hall said she did not agree to participate in the scheme at that time, but the defendant continued discussing the idea "quite a few" more times as the two of them saw each other regularly.  Ms. Hall finally agreed to participate in the robbery

approximately two weeks after the defendant initially broached the subject because "[m]oney got tight on both ends."

Ms. Hall testified that she talked to Kyle Peters about the fake robbery. She and Mr. Peters had been very close friends "for quite some time," and she brought up the fake robbery idea to him during a conversation that turned to financial problems. She recalled that she was "coming off of probation soon" for a driving on a suspended license charge and "needed the money" to help pay her court costs. Mr. Peters' first reaction was that "it was just crazy."

Ms. Hall testified she and the defendant did not pick a certain date for the fake robbery, but they discussed it in the days leading up to October 1, 2013. Ms. Hall testified that she usually worked the closing shift at Murphy Mart, which was from around 4:30 p.m. to midnight, and that she worked that shift on September 30, 2013. On that date, Mr. Peters came to the store and bought gasoline, cigarettes, and a drink. He told Ms. Hall that he was going to be a father and that he had financial problems as well, and he asked her how a fake robbery would work. Ms. Hall "walked him through" the scenario that the defendant had developed, and Mr. Peters thought it sounded like a "good idea." Ms. Hall and Mr. Peters discussed the placement of the security cameras and how to avoid them, based on what the defendant had told Ms. Hall. Ms. Hall and Mr. Peters also concocted a story about why they were at a specific place at a specific time in case they got caught.

Ms. Hall testified that she finished her shift that night and went to the defendant's residence, arriving around 1:00 a.m. Mr. Peters followed her to the defendant's residence, and the three of them discussed the fake robbery for thirty to forty minutes. The plan was for Mr. Peters to wear a pair of the defendant's husband's black jogging pants and a black pullover that the defendant brought out of her bedroom, as well as Mr. Peters' boots and a Halloween mask he was to purchase at Walmart "to make it look real." The three also discussed what they would do if they "got caught." The defendant was to make the police report, "so she would just throw them off and give them some crazy description of this man." Ms. Hall was to say that she had gone into work that morning in order to help the defendant hang up signs. Ms. Hall and Mr. Peters were going to drop the defendant off at work, and then she and Mr. Peters were going to Walmart to buy a mask, tape, and spray paint.

Putting the plan into action, around 2:30 or 3:00 a.m. the defendant drove herself, Ms. Hall, and Mr. Peters to the Murphy Mart in her van and got out. Ms. Hall then drove the defendant's van to Walmart, where she and Mr. Peters purchased the needed items. The two then drove the van to the other side of the Walmart parking lot, closer to Murphy Mart. Ms. Hall exited the van, avoided the security cameras, spray-painted the camera outside the kiosk, and then returned to the van. Ms. Hall believed that twenty-five

minutes had elapsed since she had dropped off the defendant. Ms. Hall said that she was 4'11" tall and that there was a step stool sitting under the camera when she got there, enabling her to reach the camera. The step stool was usually kept inside the cashier area so employees could reach items on a high shelf. The step stool had not been outside under the camera when she finished her shift a few hours earlier. During the time leading up to Ms. Hall's spray-painting the camera, she and the defendant had "several conversations" on their cell phones and through text messages in which Ms. Hall kept the defendant apprised of her whereabouts.

Once Ms. Hall returned to the van, Mr. Peters got out and went to commit the fake robbery. Ms. Hall called the defendant to let her know "he was fixing to be there." Thereafter, Mr. Peters called Ms. Hall to tell her that he was finished, and she picked him up between Murphy Mart and a bank. The two left the scene and drove down Chicken Creek Road, discarding plastic drop slips, checks, spray paint, a mask, and other incriminating evidence out the window as they drove. Ms. Hall noted that, when she and the defendant planned the robbery, they had no idea how much money would be in the safe but were expecting it to be several thousands of dollars. Ms. Hall then drove to the defendant's house, where she dropped Mr. Peters off at his car and gave him $1000 to "take back to his wife and try to explain why he had been gone all night."

Ms. Hall testified that she initially hid the money in a laundry basket in an R.V. behind the house, as the defendant had suggested. However, Ms. Hall saw some of her daughter's clothes in the laundry basket and did not want to risk her daughter finding the money, so she put the money in some bushes on the defendant's property. Ms. Hall then went back to Murphy Mart because, according to their story, Ms. Hall was going in to help the defendant hang up signs for the first of the month at which point she would discover that the defendant had been robbed.

When Ms. Hall got to the store, there was a customer waiting at the window and the defendant was not there. The keys were in the door to the cashier area, so Ms. Hall took the keys from the door, unlocked the storage room door, and "found" the defendant. Ms. Hall untied the defendant's arms which were not bound "very tight . . . at all," and she retrieved some scissors to cut away the tape binding the defendant's feet. Ms. Hall then called the police.

Ms. Hall testified that, when the police officers arrived at the scene, she initially said that a robbery had occurred. However, as more evidence developed, she admitted that she had been part of the crime, explaining that she thought it was "better . . . being honest than trying to lie about it." She later took officers on the route where she and Mr. Peters had thrown out "all the slips and stuff," and she showed the officers where the money was hidden in the bushes at the defendant's house.

5

Ms. Hall testified that there were no records of the calls and texts she and the defendant sent each other during the fake robbery because they used prepaid cell phones. She said that she deleted the calls and texts from her phone before the police responded to the scene, and she assumed that the defendant did the same.

On cross-examination, Ms. Hall admitted that, when she was initially interviewed at the police station, she told officers she had used the defendant's van during those early morning hours to help a friend who had car problems. She continued to lie when originally confronted with the surveillance footage from Walmart showing her buying a mask, duct tape, and spray paint. After a break, the interviewing officer re-entered the room and put a bag of money down on the table, saying that Mr. Peters had turned over the $1000 she had given him. She told the officer that she did not know where the remaining money was, but that was a lie. When Ms. Hall realized that she could not lie her way out of the situation, she decided to be a witness for the State against the defendant because she was afraid of what would happen to her and her daughter.

Ms. Hall further testified on cross-examination that the fake robbery was the defendant's idea and that they both had financial problems at the time. Ms. Hall acknowledged that she knew where the security cameras were located at Murphy Mart, although she did not know what views each covered.

Kyle Peters testified that he was a co-defendant in this case and had been charged with theft over $10,000 and conspiracy to commit theft over $10,000. He admitted that he had also accepted a plea agreement in exchange for his testimony against the defendant. Mr. Peters stated that he and Ms. Hall had known each other for many years and had "almost like a brother and sister bond." Prior to the date of the incident, Mr. Peters knew of the defendant through Ms. Hall, but they were not friends.

Mr. Peters testified that the first time Ms. Hall discussed the potential robbery with him was the night that it occurred. He said that he went to Murphy Mart to get some gasoline and Ms. Hall started talking about the fake robbery, showing him "where the cameras were and about how to go about it." He did not take Ms. Hall seriously at first and left. However, he thought about it for a while and decided to go back to the store to talk more about it. When he returned to the store, Ms. Hall talked to him about where the cameras were and which cameras covered which parts of the store. She told him they could cover the cameras with spray paint or a bag. She also told him "about all the bank drops that she had made, how much money was in the safe at that time." Mr. Peters said that Ms. Hall estimated that there was $12,000 in the safe.

Mr. Peters testified that, after Ms. Hall's shift, Ms. Hall's boyfriend drove her to the defendant's house, and Mr. Peters followed them. The three of them went inside, and Ms. Hall, Mr. Peters, and the defendant discussed the robbery in the living room while

Ms. Hall's boyfriend was "dead asleep." The defendant told Ms. Hall and Mr. Peters that because it was the first of the month, she had to go in early to switch out the stickers on the vending machines. She told them that the safe would not open for thirty minutes to an hour after she punched in the code. The group talked about the robbery from approximately midnight until 2:30 or 3:00 a.m. Near the end of their discussion, the defendant said that if they got caught, "she didn't want to be a part of this, that it was pretty much on [Mr. Peters and Ms. Hall] and she didn't want nothing to do with it."

Mr. Peters testified that, when it was time for the defendant to leave for work, the defendant told him to put on a pair of dark sweatpants that were in a laundry basket by the couch. However, he acknowledged on cross-examination that he had testified at the preliminary hearing that the defendant "brought out a bag of clothes" for him to wear. Mr. Peters stated that the defendant also told him and Ms. Hall where to drop her off at work and where to wait for her to call them in order to not be detected by security cameras. She also told them where to drive in order to remain undetected before and after the fake robbery.

At approximately 2:30 or 3:00 a.m., Mr. Peters and Ms. Hall took the defendant to work in the defendant's van. The two of them then went to Walmart after realizing that it would be a good idea to get a mask in case a security camera caught Mr. Peters' image. They also bought spray paint and duct tape. They waited for a while in the parking lot, then Ms. Hall spray-painted one of the cameras and returned to the van. The defendant called Ms. Hall and told her that "you couldn't see anything on the camera, that it was spray painted and it was all blacked out." Thereafter, the two continued to wait for the defendant's call informing them when the safe was open. Mr. Peters believed that twenty to thirty minutes passed before the defendant called to say it was open.

Mr. Peters testified that he walked up to the store and called the defendant's name. The defendant glanced up at him but continued to do what she was doing. She then walked around to the room with the safe, without making eye contact, and opened the door to the room. The defendant went to the safe, sat down in front of it, and started pulling out the money. Mr. Peters had a bag in his hand, and the defendant put the money into the bag. Mr. Peters then took the defendant to the storage room in the back, and the defendant told him to tie her up. He bound the defendant's wrists loosely with duct tape and also bound her feet. The defendant told him to take the key, lock the door, and drop the keys on the floor outside. He did as he was told.

Mr. Peters testified that he called Ms. Hall to come pick him up. As they drove on a back road, they threw the "little plastic slips that the money was in" out the window. He also threw his mask and other incriminating paraphernalia out the window. They drove to the defendant's house, and Ms. Hall gave Mr. Peters $1000 to take home. They put the rest of the money under some laundry in a camper in the backyard. He said that

the idea to put the money in the camper was "just kind of something [they] thought up on the top of [their] head." Mr. Peters testified that police officers came to his house around 10:00 a.m. the next morning. He confessed to the officers immediately because he "knew [he] had done it . . . and there was nothing [he] could do about it[.]"

Detective Joey Turner with the Pulaski Police Department testified that he responded to a robbery call at the Murphy Mart in the early morning hours of October 1, 2013. When he arrived, he talked briefly with Sergeant Keith Crabtree, as well as the defendant and Ms. Hall, who were present at the scene. The defendant provided a detailed description of the robber: "a 6'6" male believed to be a white male, black hoodie but white mask, black pants, black work boots with brown shoe strings, brown gloves." The defendant did not appear to be "visibly shaken." The defendant's arms did not have any chafing or redness consistent with having been bound with duct tape for an extended period of time, even though she was wearing a short sleeved shirt. The defendant said that she had been "bound with the duct tape to the front of the area. But when she told [Detective Turner] she put her hands behind her back . . . . [The officers] said, well, that doesn't make any sense. She said, no, I was bound to the front." Detective Turner identified several photographs of the crime scene for the jury. In the store room area, there was duct tape on the floor that Ms. Hall had supposedly cut off from the defendant's wrists. A photograph taken in the office area showed yellow and clear deposit bags that were hanging on the wall. The bags were the same kind that Ms. Hall testified to having thrown out of the van window after the robbery.

Detective Turner obtained a receipt from Walmart. He elaborated that he saw a security camera that had been spray-painted and knowing that not many stores were open late at night, he sent Officer Andy Griggs to Walmart to ask employees if anyone had bought spray paint, gloves, a mask, or duct tape. He specifically wanted to know if anyone had purchased Duck Tape brand duct tape as an empty roll of that brand was found in the store room. Officer Griggs did as Detective Turner instructed, and they discovered that Ms. Hall's debit card had been used to purchase those items.

Detective Turner also took photographs of items found inside the defendant's van, including a Walmart receipt for items used in the robbery; Ms. Hall's debit card; two cartons of cigarettes, which was significant because the robber stole cigarettes during the robbery; and a deposit bag like those used by Murphy Mart. Another officer took a photograph of the money found in the bushes on the defendant's property. The total amount of money recovered in the case was $10,397. The sweatpants and sweatshirt worn by Mr. Peters were also in the defendant's van.

Detective Turner testified that spray paint covered the entire front of the security camera that focused on the door going into the office. A box that was in front of the drink machines had paint on it, but it was situated in such a way that the paint was facing

the drink machines and not visible. The defendant told Detective Turner that she had leaned the box against a wall that would have been underneath the camera, but, "[a]fter she got things situated, she moved the box over there and started hanging her signs." Detective Turner believed that the box with spray paint was important because "it was moved" by the defendant and in a manner such that the paint was not visible.

Detective Turner testified that the defendant denied any involvement in the robbery. During her interview, the defendant initially gestured that her wrists were bound behind her, while saying they were bound in the front. When Detective Turner told her that did not make sense, she said they were bound in the front. Detective Turner said that the defendant had a prepaid cell phone, so he could not obtain any call records from her phone. He recalled that Ms. Hall told him she had deleted all of her calls and text messages.

Detective Turner testified that the security video from Murphy Mart showed the defendant arriving at the store at 2:57 a.m. From 2:59 to 3:00 a.m., the defendant opened the safe and looked as if she was preparing the cash register for the day. The video showed the defendant getting money from a cigar box underneath the counter to put in the register. At 3:20 a.m., one outside camera went black. On another outside camera, Detective Turner caught a glimpse of the pants and feet of someone walking by, and that clothing was consistent with what Ms. Hall was wearing that night on a Walmart surveillance video. Detective Turner's investigation revealed that the robbery took place at 3:55 a.m. Security footage from Walmart showed Ms. Hall and Mr. Peters arriving at the store at 2:58 a.m. in the defendant's van and leaving the store at approximately 3:12 or 3:13 a.m. Ms. Hall was carrying a bag when she left the store.

As part of his investigation, Detective Turner investigated the defendant's financial situation. In looking through the defendant's personal planner, he found a receipt for a payment of $160 to Title Max for a loan she had received. The check was written on September 27, 2013. Detective Turner also found a document from Heritage Diagnostic from August 19, 2013, substantiating that the defendant had some health issues but also showing that she had medical insurance. He also found a receipt from Covington Credit dated August 30, 2013, showing that she made a payment of $102 and had another payment of $87 due on September 18, 2013. Another receipt from Orton Used Cars showed that the defendant paid $400.68 on August 2, 2013. Detective Turner acknowledged that none of the paperwork supported the assertion that the defendant was in financial distress.

Lieutenant Joel Robison with the Pulaski Police Department testified that he responded to the crime scene at Murphy Mart on October 1, 2013, where he briefly observed the defendant. He noted that the defendant did not seem distraught or upset. Lieutenant Robison later interviewed the defendant at the police station. He noticed that

the defendant's description of how she was duct-taped did not coincide with what she had said in an earlier statement. He also observed that the defendant did not have any redness or chafing on her wrists.

## Defendant's Proof

Robbie Stanford, the defendant's husband, testified that the clothes Mr. Peters wore during the robbery were not his and that the police never questioned him about them. Mr. Stanford showed the jury printouts of his mortgage payments from May 2013 to the time of trial. The report showed that he and the defendant paid their mortgage regularly, they were not in arrears on any payment, and their home was not in foreclosure. Mr. Stanford said that he had worked for a machine and tool company for twenty-two years and earned $13 an hour. He said that he and the defendant lived paycheck to paycheck but were not in financial straits "[n]o more than normal" in October 2013. He and the defendant had medical insurance at the time of the offenses. Mr. Stanford said that he was not awakened by people coming to his house at any time during the early morning hours prior to the incident. On cross-examination, Mr. Stanford admitted that he told Detective Turner he did not know that the defendant had taken out a title loan on the van.

John Sanders, from the neighboring city of Lawrenceburg's police department, testified that his job duties included "[f]orensics on cell phones and computers." Detective Turner asked Mr. Sanders to review three cell phones involved in the case. One of the phones was a smartphone, from which he was able to retrieve hundreds of pages of activity records. Mr. Sanders stated that he would expect to be able to retrieve any data or activity that took place on such a phone within hours of it being taken into police custody, despite whether the phone's user had "deleted" the data or activity. The other two phones were "track phones," and he did not have the equipment to get a "data dump" off of them. However, the data from a track phone could be retrieved by shipping the phone to a restoration service that could remove a chip from the phone and retrieve the data.

Lavonne Manning, the store manager at the Murphy Mart involved in this case, testified that she knew of Mr. Serrano's policy of not opening the store safe "until probably the time we open the store" but, in reality, she keyed the safe when she arrived at work because it took several minutes to open. She noted that other activities involving the safe had to be completed each day, such as counting lottery tickets and coupons. She said that opening the safe when she arrived to work allowed her to complete the multiple tasks that had to be done. On cross-examination, Ms. Manning recalled that the defendant received a "few calls" at work asking for the defendant by her first name, rather than by her middle name as everyone called her, which made Ms. Manning think the caller was a "bill collector." Ms. Manning acknowledged that she told Detective

Turner that the defendant had told her she had to have her house refinanced and had financial problems.

The defendant testified that she had worked for Murphy Mart since November 2007 and was an assistant manager at the time of the offenses. She recalled that Ms. Hall started working at the store approximately six months prior to the offense. Ms. Hall was a friend of the defendant's oldest stepdaughter, and the defendant "tr[ied] to help her out." Ms. Hall lived on the defendant's property "[o]ff and on for a few years." According to the defendant, when Ms. Hall lived with them, she sometimes "would be gone two or three days and no word or nothing," so she and her husband had to care for Ms. Hall's daughter. The defendant said that, at the time of the robbery, the defendant's camper was "full of" Ms. Hall's and her daughter's clothes and belongings.

The defendant testified that she was Ms. Hall's supervisor at work and they "had issues with [her] almost from the time she started until the time she done this." Through discussions with Mr. Serrano, the defendant was aware that Ms. Hall was going to be losing her job at Murphy Mart within a couple of weeks. She gave Ms. Hall "a heads-up that she needed to find her another job." The defendant said that she knew Mr. Peters only in passing and had never socialized with him. The defendant denied having financial troubles at the time of the incident. She acknowledged that she had some health issues, but she had medical insurance through her job at Murphy Mart.

The defendant testified that she had to be at work at 3:00 a.m. on October 1, 2013, and Ms. Hall volunteered to go with her to help with extra tasks to receive overtime pay. The defendant drove the two of them in her van and, en route, Ms. Hall received a phone call after which she asked if she could use the defendant's van "real quick to help a friend out." Ms. Hall explained to the defendant that she needed to pick up a car part for a friend and bring it back to the Walmart parking lot. The defendant said that she was "in desperate need of help," but she told Ms. Hall to go and return to work as soon as possible. The defendant said that, from the time she woke up to the time Ms. Hall dropped her off at work, she did not see Mr. Peters.

The defendant testified that, upon arriving at work, she went through her normal procedure of "key[ing] the safe" and starting "regular office work." In watching the surveillance footage of her activities that morning, the defendant pointed out the "[f]irst of the month box," which contained stickers and signs for the store. She said that she moved the box to the door to get it out of her way while she did other chores. After working on other things for thirty minutes, the defendant pulled the "first of the month box" over to the cooler so she could put up the new signs. She did not notice any paint on the box.

11

The defendant stated that, as she was walking around a cooler, someone came up behind her, held something to her back, and told her to open the office door. The robber told her to kneel down and hand him the money from the safe, and she complied. The robber then grabbed her and took her to the store room, where he taped her arms and legs. She said that her arms were bound behind her back. She was unable to free herself so she remained lying on the floor for approximately an hour until Ms. Hall arrived and freed her.

The defendant denied any involvement in the robbery or planning it. She stated that anyone who worked at Murphy Mart would be familiar with the surveillance system and know which cameras pointed in what direction. However, only managers at Murphy Mart were allowed to deal with Walmart's loss prevention staff and thereby know that Walmart's video cameras showed the Walmart parking lot, as well as the Murphy Mart.

Following the conclusion of the proof, the jury convicted the defendant, as charged, of theft of property in an amount of $10,000 or more, filing a false report, and conspiracy to commit theft in an amount of $10,000 or more.

## ANALYSIS

The defendant challenges the trial court's denial of her motion for judgment of acquittal and the sufficiency of the evidence at trial, arguing there was insufficient evidence to corroborate the testimony of the two accomplices. Although worded differently, each of these issues is essentially a challenge to the sufficiency of the convicting evidence.

In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are

consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (Tenn. 1966) (citing Carroll v. State, 370 S.W.2d 523, 527 (Tenn. 1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

"An accomplice is defined as a person who knowingly, voluntarily and with common intent unites with the principal offender in the commission of the crime." State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (citing State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992)). A criminal defendant in Tennessee cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001) (citing State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994)); State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). This principle has been described as follows:

> "[T]here must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative

13

evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."

Bigbee, 885 S.W.2d at 803 (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)). Whether sufficient corroboration exists is for the jury to determine. State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001). The jury determines "the degree of evidence necessary to corroborate the testimony of an accomplice, and it is sufficient 'if there is some other evidence fairly tending to connect the defendant with the commission of the crime.'" State v. Anderson, 985 S.W.2d 9, 16 (Tenn. Crim. App. 1997) (quoting Clapp v. State, 94 Tenn. 186, 30 S.W. 214, 217 (Tenn. 1895)).

The defendant complains that the accomplices contradicted one another on various points in their testimony and that the evidence corroborating their testimony is insufficient. However, any discrepancies between Ms. Hall's and Mr. Peters' testimony were heard and assessed by the jury as the trier of fact. Moreover, the evidence of corroboration is sufficient to connect the defendant to the commission of the offenses.

Ms. Hall and Mr. Peters testified that they went to Murphy Mart in the defendant's van and dropped her off for her shift. Video from Walmart shows the defendant's van arriving in the parking lot at 2:58 a.m. Also, Ms. Hall and Mr. Peters testified they hid the stolen money in the defendant's camper, but Ms. Hall later moved the money into bushes on the defendant's property. It is a reasonable inference that Ms. Hall hid the money on the defendant's property, and not someplace unrelated to the defendant, because the defendant was a member of the conspiracy. In addition, Detective Turner found a box with spray paint on it that was situated by the defendant in such a way that the paint was not visible. The defendant admitted that the box had been sitting under the security camera that was "blacked out" and that she had moved it. Further, Detective Turner found items used in the robbery, Ms. Hall's debit card that was used to purchase said items, a deposit bag, and the pants and sweatshirt Mr. Peters wore during the robbery, in the defendant's van. It is, again, a reasonable inference that Ms. Hall was not concerned about leaving incriminating evidence of the robbery in the defendant's van because the defendant was a member of the conspiracy. Moreover, police officers testified that the defendant gave inconsistent statements about the manner in which her wrists were bound, and that there was a lack of redness or chafing around her wrists despite having been bound with duct tape. Finally, there was testimony about the reason

14

for the conspiracy to commit the fake robbery.  Ms. Hall testified that the defendant told her she was having financial trouble and mentioned the idea of a fake robbery.  Ms. Manning, the store manager who was not an accomplice in this case, testified that the defendant had told her she had money problems, and Ms. Manning knew of instances where apparent debt collectors called the store asking for the defendant.  Mr. Stanford, the defendant's husband, admitted that the defendant had apparently taken out a title loan on the van without his knowledge.

Again, "[t]he corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration."  Bigbee, 885 S.W.2d at 803 (quoting Gaylor, 862 S.W.2d at 552).  We conclude that there was sufficient evidence to corroborate the testimony of Ms. Hall and Mr. Peters that the defendant participated in the planning and commission of the fake robbery.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

15